JS-6

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| WALLSTER, INC., dba WALLSHOPPE, a California corporation, individually and on behalf of similarly situated persons,<br><br>Plaintiff,<br><br>v.<br><br>REDBUBBLE, INC., a Delaware corporation; and DOES 1 through 60, inclusive,<br><br>Defendants. | Case No. 2:22-cv-02958-WLH-MARx<br><br>**ORDER GRANTING DEFENDANT REDBUBBLE'S MOTION FOR SUMMARY JUDGMENT [51] AND DENYING MOTION TO DENY CLASS CERTIFICATION [48]** |

Defendant Redbubble, Inc. ("Redbubble") moves for summary judgment against Plaintiff Wallster, Inc., dba Wallshoppe ("Wallshoppe"). (Joint Br. re Redbubble's Mot. for Summ. J. ("Joint Br."), Docket No. 51). It also moves to deny class certification. (Mot. to Deny Class Cert., Docket No. 48). On February 9, 2024, the Court held a hearing and heard oral argument from both parties. For the following reasons, the Motion for Summary Judgment (the "Motion") is **GRANTED**, and the Motion to Deny Class Certification is **DENIED** as moot.

## I. BACKGROUND

### A. Redbubble's Service

This is a copyright class action stemming from the sale through Redbubble's website of products bearing Wallshoppe's copyrighted design. (Third Am. Compl. ("TAC"), Docket No. 30 ¶¶ 25–28). Redbubble is the operator of a "global online marketplace" (the "Marketplace") hosted at Redbubble.com. (Joint Appendix of Facts ("JAF"), Docket No. 58 ¶ 1).[1] Redbubble allows third-party artists to use the Marketplace "to upload and sell their designs on high-quality, everyday products such as apparel, stationery, housewares, and bags." (*Id.* ¶ 16). Millions of third-party artists have uploaded at least one design to the Marketplace, and tens of thousands of listings are uploaded to the Redbubble Marketplace each day. (*Id.* ¶¶ 18, 20). Third-party sellers must register before they can upload designs to the Marketplace. (*Id.* ¶ 21). Each time a seller uploads a design to the Marketplace, the seller must confirm that he or she has the right to sell products containing the design. (*Id.* ¶ 22).

Redbubble asserts that "[a]ll content offered for sale on the Marketplace was designed and uploaded solely by third-party Sellers, without any participation by Redbubble." (*Id.* ¶ 31). Sellers choose the products they wish to sell their design on. (*Id.* ¶ 34). They then set the "artist margin," which is capped at 5000% over the base price of the product. (*Id.* ¶ 35). The base price includes Redbubble's fixed service fee and a manufacturing fee charged by the manufacturer. (*Id.* ¶ 37). A seller may also input keywords, or "tags," as well as a product description to enable Redbubble users to search for designs. (*Id.* ¶¶ 39–41). After the seller uploads an image, he or she may create a "digital product preview by positioning and scaling [the] uploaded image on a generic template" of the product. (*Id.* ¶ 46). This is the image potential customers see when browsing products in the Marketplace. (*Id.* ¶ 49).

---

[1] To the extent the Court cites facts that are listed as "disputed" in the JAF, the Court finds that the disputes are not genuine and/or material. To the extent the Court cites facts to which one of the parties objects, it overrules those objections. All other objections are overruled as moot.

When a customer purchases a product, "Redbubble Marketplace software automatically performs various online services to facilitate the transaction[]." (*Id.* ¶ 53). This includes "connect[ing] third-party Sellers to third-party printers who print the products," (*id.* ¶ 54), and "automatically rout[ing] purchase order and shipping information to third-party printers," (*id.* ¶ 55), who then print and pack the products, (*id.* ¶ 56). Third-party shippers then pick up the products and deliver them to customers. (*Id.* ¶ 72). Redbubble's name appears on the packages, (*id.*), but Redbubble does not supply the packaging materials, (*id.* ¶ 71). Redbubble asserts that it "does not design, upload, manufacture, sell, offer for sale, or distribute the content printed on finished products, and at no time during the purchasing, manufacturing, or shipping process does [it] possess, store, or physically handle finished products." (*Id.* ¶ 81).

### B. Redbubble's Content Moderation Practices

To address copyright and trademark infringement in the Marketplace, Redbubble has implemented certain content moderation practices. Complainants may submit takedown notices to Redbubble regarding particular listings that infringe their intellectual property. (*Id.* ¶ 103). When Redbubble receives such a notice, it "promptly (i.e., typically within one business day) removes those listings and notifies the third-party Seller who uploaded them." (*Id.*). It also has a policy of "disabl[ing] and/or terminat[ing] the accounts of users who repeatedly infringe or are repeatedly charged with infringing … intellectual property rights." (*Id.* ¶ 104).

In addition to notice and takedown procedures, Redbubble conducts proactive screening for infringement of certain copyright owners' work with the help of an outside agency called Teleperformance. (*Id.* ¶¶ 109, 278). Content moderators at Redbubble and Teleperformance conduct proactive screening by using various proprietary tools to weed out potential infringers, including text-in-image matching, (*id.* ¶ 112), image recognition software that "match[es] uploaded images against a reference database of images that are known to contain content that has been identified as third-party intellectual property," (*id.* ¶ 119), and a "real-time duplicate detection tool that finds

duplicates of previously moderated images that Sellers may try to reupload," (*id.* ¶ 120). When Redbubble's software identifies potentially infringing material, the flagged listing is "removed from public view until a member of the [content moderation team] reviews those listings against Redbubble guidelines." (*Id.* ¶ 113–14, 121). Finally, Redbubble uses a "backend proactive screening software tool" that allows content moderators to run searches on terms they generate based on "protected words or images provided by a content owner, such as trademarks, copyright-protected images, name and likeness." (*Id.* ¶ 125). A member of the content moderation team then manually goes through the search results "to identify content that matches the policing guidelines, and is therefore potentially infringing." (*Id.* ¶ 128). All proactive screening involves human review. (*Id.* ¶ 137). Redbubble contends that "[d]ue to the volume of takedown requests Redbubble receives, and the manual review during all proactive screening, it would not be operationally feasible to provide proactive screening to every rightsholder that submits a takedown request." (*Id.* ¶ 138).

### C. **The Pacifico Palm Design**

Wallshoppe "sells high-quality wallpaper featuring various designs to consumers throughout the United States." (TAC ¶ 22). Wallshoppe owns the copyright in its designs. (*Id.* ¶ 23). One of Wallshoppe's copyrighted designs is the "Pacifico Palm Design":



(*Id.* ¶ 24; Ex. A). According to Wallshoppe, the Pacifico Palm Design is one of its "best-selling and most recognizable designs." (*Id.* ¶ 25). The design was created by Nathan Turner, an interior designer who is also an equity partner in Wallshoppe, (Joint Appendix of Evidence ("JAE"), Docket No. 51-2, Ex. 24 at 6–7), in collaboration with Wallshoppe employees, (*id.*, Ex. 39 at 4).

In late 2021, Wallshoppe discovered that Redbubble was selling products featuring the Pacifico Palm Design. (*Id.* ¶ 26). On October 19, 2021, Kiarash Neman, a Wallshoppe employee, submitted a takedown notice to Redbubble. (JAF ¶ 183; JAE, Ex. 18). The takedown notice included a single URL for a listing that bore the Pacifico Palm Design. (JAE, Ex. 18). Mr. Neman also wrote, "[t]here are currently 28+ listings from [the same seller] with that design. Please remove all listings with that design immediately." (*Id.*). On October 20, 2021, Mr. Neman received a response from a Redbubble representative that said Redbubble had "removed the content [Mr. Neman] referred to" and "written to the relevant end user about [his] complaint and the content [Redbubble] removed." (*Id.*). That same day, Mr. Neman submitted another takedown notice, this time with two URLs and an explanation that the seller had "64 total items" bearing the design. (JAE, Ex. 19). On October 21, 2021, a Redbubble representative sent the same response to Mr. Neman as it had regarding Mr. Neman's previous takedown notice, assuring Mr. Neman that Redbubble had removed the content. (*Id.*). In fact, Redbubble had removed the content at the three URLs that Mr. Neman sent in his takedown notices, but it appears that it did not go through the listings of the sellers Mr. Neman identified to remove other content with the Pacifico Palm Design. (JAF ¶¶ 189, 196, 296). Wallshoppe did not submit any further takedown notices to Redbubble. (*Id.* ¶ 200).

On May 3, 2022, Wallshoppe filed this putative class action alleging one claim for copyright infringement under 17 U.S.C. § 101, *et seq.* (Compl., Docket No. 1). Wallshoppe alleges that Redbubble directly and vicariously infringed Wallshoppe's copyright by selling unlicensed products bearing its copyrighted work (the "Accused

5

Products"). (TAC ¶¶ 54–58). The same month that Wallshoppe initiated the case, Redbubble implemented "proactive screening" for Wallshoppe. (JAF ¶ 288). Wallshoppe contends, however, that products bearing the Pacifico Palm Design "remained on products offered for sale on the Redbubble platform through at least July of 2022." (*Id.* ¶ 296).

Redbubble now moves for summary judgment on the bases that (1) Wallshoppe does not have standing to bring this action, (2) Redbubble is not liable for either direct or vicarious infringement, and (3) Wallshoppe cannot obtain the relief it seeks because Redbubble is protected under the Digital Millennium Copyright Act ("DMCA"). (*See generally* Joint. Br.).

**II. DISCUSSION**

A motion for summary judgment must be granted when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). The moving party bears the initial burden of identifying the elements of the claim or defense and evidence that it believes demonstrates the absence of an issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986).

Where the nonmoving party will have the burden of proof at trial, as here, the movant can prevail by pointing to an absence of evidence to support the nonmoving party's case. *Id.* The nonmoving party then "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248. Where the record "taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The Court must draw all reasonable inferences in the nonmoving party's favor. *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010) (citing *Anderson,* 477 U.S. at 255). Nevertheless, it is the nonmoving party's obligation to produce factual predicates from which an inference may be drawn.

*Richards v. Nielsen Freight Lines,* 602 F. Supp. 1224, 1244–45 (E.D. Cal. 1985), *aff'd,* 810 F.2d 898 (9th Cir. 1987). "[M]ere disagreement or the bald assertion that a genuine issue of material fact exists" does not preclude summary judgment. *Harper v. Wallingford*, 877 F.2d 728, 731 (9th Cir. 1989).

The Court first addresses Redbubble's argument that Wallshoppe does not have standing to bring this case. It goes on to discuss whether Redbubble is protected from Wallshoppe's claims for copyright infringement under the safe harbor provisions of the DMCA.

## A. **Standing**

In a copyright action, the plaintiff has the burden to "establish[] a qualifying ownership interest both as a substantive element of the infringement claim and as a necessary predicate for standing to bring the claim." *DRK Photo v. McGraw-Hill Glob. Educ. Holdings, LLC*, 870 F.3d 978, 986 (9th Cir. 2017) (citing *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., Inc.*, 499 U.S. 340, 361 (1991); 17 U.S.C. § 501(b)). Wallshoppe asserts that it is the sole owner of the copyright in the Pacifico Palm Design, as evidenced by a July 2016 copyright registration that lists the author of the Design as "Wallshoppe." (TAC, Ex. A, Docket No. 30-1).

"[I]f a copyright holder secures a registration certificate within five years after first publication, such certificate will constitute prima facie evidence of both the validity of the copyright and the facts stated in the certificate." *Cosmetic Ideas, Inc. v. IAC/Interactivecorp*, 606 F.3d 612, 619 (9th Cir. 2010) (citing 17 U.S.C. § 410(c)), *abrogated on other grounds by Fourth Estate Pub. Benefit Corp. v. Wall-Street.com, LLC*, 139 S. Ct. 881, 886–87 (2019). That includes the fact of ownership as stated in the certificate. *See, e.g., Milton H. Greene Archives, Inc. v. BPI Commc'ns, Inc.*, 378 F. Supp. 2d 1189, 1194 (C.D. Cal. 2005) ("A certificate of registration is prima facie evidence of ownership of a copyright."). Such a certificate "shifts to the defendant the burden to prove the invalidity of the plaintiff's copyrights." *Ent. Rsch. Grp., Inc. v.*

*Genesis Creative Grp., Inc.*, 122 F.3d 1211, 1217 (9th Cir. 1997) (quoting *Masquerade Novelty, Inc. v. Unique Indus., Inc.*, 912 F.2d 663, 668 (3d Cir. 1990)).

Nevertheless, Redbubble argues that Wallshoppe cannot establish it owned the Pacifico Palm Design at the time the case was initiated. (Joint Br. at 18–19). Redbubble bases this argument on one of Wallshoppe's responses to Redbubble's interrogatories, in which Wallshoppe stated that "[t]he author of the artwork is Nathan Turner, who created it as a work-for-hire for" Wallshoppe. (*See id*; JAF 219). Redbubble contends that Wallshoppe has no evidence that the Pacifico Palm Design was actually a work for hire and that Wallshoppe therefore has not borne its burden to establish standing.

The Copyright Act defines a "work made for hire" as "(1) a work prepared by an employee within the scope of his or her employment," or "(2) a work specially ordered or commissioned" for one of several specified uses "if the parties expressly agree in a written instrument signed by them that the work shall be considered a work made for hire." 17 U.S.C. § 101. If the plaintiff claims the latter requirement is met, it must show an express agreement existed before the work was created, as "[t]he plain language of the statute indicates that a work-for-hire agreement cannot apply to works that are already in existence." *Gladwell Gov't Servs., Inc. v. Cnty. of Marin*, 265 F. App'x 624, 626 (9th Cir. 2008).

Redbubble states that the first requirement does not apply here because "Mr. Turner has never been employed by" Wallshoppe. (Joint Br. at 19). As evidence, Redbubble points to the undisputed facts that "[Mr.] Turner is a Wallshoppe partner with an equity stake in the company," (JAF 251); "Wallshoppe has no payroll records related to Mr. Turner," (JAF 253); and "Wallshoppe does not withhold any income taxes on behalf of Mr. Turner," (JAF 254). Redbubble thus focuses on the second requirement and argues that Wallshoppe "cannot establish that it had a valid work-for-hire agreement with Mr. Turner at the time the complaint was filed" because the only work-for-hire agreement Wallshoppe has produced in this case was signed by Mr. Turner the day before he was deposed. (Joint Br. at 18).

Redbubble is correct that the work-for-hire agreement was executed too late to confer standing on Wallshoppe under the second requirement. It has not shown, however, that the first requirement does not apply here. That is, none of the evidence Redbubble raises defeats Wallshoppe's assertion that Mr. Turner was an employee working in the scope of his employment when he created the Pacifico Palm Design. "The typical work for hire dispute involves a disagreement between the commissioning party or employer and the commissioned party or employee over who owns the copyright." *Jules Jordan Video, Inc. v. 144942 Canada Inc.*, 617 F.3d 1146, 1156 (9th Cir. 2010) (citing *Community for Creative Non–Violence v. Reid,* 490 U.S. 730, 733–36 (1989)). Here, there is no dispute between Mr. Turner and Wallshoppe that the Pacifico Palm Design was a work made for hire. Moreover, at his deposition, Mr. Turner testified that he created the Pacifico Palm Design in collaboration with other Wallshoppe employees:

> Q. Were any Wallshoppe employees working with you to create the Pacifico Palm design?
>
> A. Yeah. Late -- yes. Later. Like I said earlier, once I come up with the ideas and the concepts and the overall design, they -- they -- I bring it to them. And then they start tweaking colors and scale for me, and getting things -- showing me strike-offs, and, you know, creating -- actually creating something tangible that then I can make notes on and change.

(JAE Ex. 39 at 4).

In sum, not only does Wallshoppe's copyright registration constitute prima facie evidence of its ownership of the copyright, but the evidence also shows that Mr. Turner collaborated on the design with Wallshoppe employees in the scope of his employment. This satisfies the Court that Wallshoppe owns the copyright in the Pacifico Palm Design and has standing to bring this case.

## B. DMCA Safe Harbor

Turning to the merits of the case, the Court begins by addressing Redbubble's argument that it is protected from liability by the DMCA. *Cf. Corbis Corp. v.*

*Amazon.com, Inc.*, 351 F. Supp. 2d 1090, 1098 (W.D. Wash. 2004) (addressing DMCA safe harbor defense before determining whether plaintiff stated prima facie case for infringement because "[t]he DMCA gives an Internet service provider … extensive protection against liability, and leaves copyright owners with only limited injunctive relief"). Section 512(c) of the DMCA provides a safe harbor from copyright claims for "infringement of copyright by reason of the storage [of material] at the direction of a user." 17 U.S.C. § 512(c)(1). Thus, "[t]o be eligible at the threshold for the § 512(c) safe harbor, a service provider must show that the infringing material was stored 'at the direction of the user.'" *Mavrix Photographs, LLC v. Livejournal, Inc.*, 873 F.3d 1045, 1052 (9th Cir. 2017) (citing 17 U.S.C. § 512(c)(1)). If the service provider does meet the threshold requirement, it must then show that (1) it complied with § 512(i)'s notice and takedown procedure; (2) "it lacked actual or red flag knowledge of the infringing material" and, if it did gain such knowledge, "act[ed] expeditiously to remove, or disable access to, the material" and (3) "it did not receive a 'financial benefit directly attributable to the infringing activity, in a case in which the service provider has the right and ability to control such activity.'" *Id.*; 17 U.S.C. § 512(c)(1). "Because the § 512(c) safe harbor is an affirmative defense, [the service provider] must establish beyond controversy every essential element" to be entitled to its protections. *Mavrix*, 873 F.3d at 1052 (citation and quotation omitted).

  1. Storage "at the Direction of the User"

Wallshoppe argues only that Redbubble does not qualify for the safe harbor provisions because it "employs a team of 'content moderators' (an outside vendor called 'Telepresence' as well as a team of content moderators employed by Redbubble) whose job it is to 'proactively screen' content being uploaded for infringement." (Joint Br. at 2). Wallshoppe states that while users uploaded the material initially, "Redbubble posted the infringing products (including the infringing products uploaded in April of 2022) after its team of content moderators reviewed and approved them." (*Id.* at 3

(citing *Mavrix*, 873 F.3d at 1048–49)). Thus, Wallshoppe asserts, storage of infringing content is not "at the direction of the user."

As a preliminary matter, there is no evidentiary basis for Wallshoppe's statement that Redbubble's content moderation team "reviewed and approved" the allegedly infringing products at issue here. Stacey Wallace, the Chief Supply Chain Officer of Redbubble, has stated that "[n]o Redbubble personnel reviewed the designs for the Accused Products prior to printing." (Decl. of Stacey Wallace, JAE Ex. 1 ¶ 14). This is in line with Redbubble's practice of conducting human review for only a small volume of listings that are flagged as potentially infringing by Redbubble's internal software, (*see* JAF ¶¶ 112, 114), which in turn is only used when Redbubble engages in "proactive policing" for a content owner, (*id.* ¶ 109). Wallshoppe does not dispute that Redbubble did not implement proactive screening for Wallshoppe until May of 2022, *after* the period in which Wallshoppe claims Redbubble's moderators approved the Accused Products. (JAF ¶ 288). Without any support for its claim that Redbubble approved the Accused Products, Wallshoppe has not "set forth specific facts showing that there is a genuine issue for trial" here. *Anderson*, 477 U.S. at 248.

This makes Wallshoppe's reliance on *Mavrix* inapposite. In *Mavrix*, the Ninth Circuit reversed a summary judgement ruling in favor of LiveJournal, a social media company whose moderators vetted all user-submitted material before posting some of the material publicly. 873 F.3d at 1052–53. The court found a genuine issue of material fact existed as to whether the moderators were LiveJournal's agents such that their acts could be attributed to LiveJournal. *Id.* at 1054–55. The court went on to explain that if the district court found, on remand, that the moderators did act as LiveJournal's agents, then it must go on to "assess whether Mavrix's photographs were indeed stored at the direction of the users in light of the moderators' role in screening and posting the photographs." *Id.* at 1056. The court further explained:

> Infringing material is stored at the direction of the user if the service provider played no role in making that infringing material accessible on its

> site or if the service provider carried out activities that were narrowly directed towards enhancing the accessibility of the posts. Accessibility-enhancing activities include automatic processes, for example, to reformat posts or perform some technological change. Some manual service provider activities that screen for infringement or other harmful material like pornography can also be accessibility-enhancing. Indeed, § 512(m) of the DMCA provides that no liability will arise from "a service provider monitoring its service or affirmatively seeking facts indicating infringing activity."

*Id.* (citations and quotations omitted).

Here, Redbubble does not dispute that its content moderators act on its behalf. But it disagrees with Wallshoppe's contention that the allegedly infringing material was not "stored at the direction of the user" because Redbubble employs a content moderation team to screen some potentially infringing material.

The Court agrees with Redbubble. The facts on the record show that Redbubble's content moderation practices do not go beyond "monitoring its service or affirmatively seeking facts indicating infringing activity." 17 U.S.C. § 512(m). Indeed, the evidence shows that, unlike the content moderators in *Mavrix*, Redbubble's content moderators manually screen only a small fraction of user-submitted material to suss out potential infringement. (*See e.g.*, JAF ¶ 112). Redbubble does not even go so far as to reformat the uploaded images. Rather, after a user uploads an image and chooses a product it wishes to sell, the user "creates the final digital product preview by positioning and scaling their uploaded image on the generic [product] template according to how the [user] wants their product preview to appear." (*Id.* ¶ 46). Assuming the product is not flagged for manual review, the product is then automatically displayed for sale on Redbubble's website. (*Id.* ¶ 116). Again, Wallshoppe has not shown that there is a genuine dispute of material fact on this point. The Court finds that Redbubble's content is "stored at the direction of the user" and thus meets the threshold for safe harbor protection under § 512(c) of the DMCA.

### 2. *Compliance with the Notice and Takedown Procedure*

Redbubble must also show compliance with the notice and takedown procedure of DMCA § 512(i). To do so, it must show that "it has a working notification system, a procedure for dealing with DMCA-compliant notifications, and [that] it does not actively prevent copyright owners from collecting information needed to issue such notifications." *Perfect 10, Inc. v. CCBill LLC*, 488 F.3d 1102, 1109 (9th Cir. 2007) (citations omitted).

Redbubble has shown that it complies with the necessary procedures. Complainants may submit takedown notices to Redbubble regarding particular listings that infringe their intellectual property. (JAF ¶ 103). When Redbubble receives such a notice, it "promptly (i.e., typically within one business day) removes those listings and notifies the third-party Seller who uploaded them." (*Id.*). It also has a policy of "disabl[ing] and/or terminat[ing] the accounts of users who repeatedly infringe or are repeatedly charged with infringing … intellectual property rights." (*Id.* ¶ 104). There is no genuine dispute as to these facts. Thus, Redbubble has met the second requirement for § 512(c) safe harbor protection.

### 3. *Knowledge of the Infringing Material and Expeditious Removal*

Redbubble has also shown that "it lacked actual or red flag knowledge of the infringing material" prior to receipt of receiving Wallshoppe's takedown notices, and that, when it did receive the notices, it "act[ed] expeditiously to remove" the material. *Mavrix*, 873 F.3d at 1052; 17 U.S.C. § 512(c)(1)). First, as discussed above, there is no evidence that Redbubble had actual knowledge of the Accused Products before it received Mr. Neman's takedown notices. Second, Redbubble acted expeditiously to remove that infringing material when it acquired actual knowledge via the takedown notices: within a day of receiving each notice, Redbubble removed the content listed at the URLs Mr. Neman provided. (JAF ¶¶ 183, 189, 196). Third, Redbubble has demonstrated that it did not have "apparent" or "red flag" knowledge of the infringing material. "[F]or red flag knowledge, infringement must be apparent, not merely

13

suspicious." *Ventura Content, Ltd. v. Motherless, Inc.*, 885 F.3d 597, 610 (9th Cir. 2018). Notably, "general knowledge that [Redbubble] hosted copyrightable material and that its services could be used for infringement is insufficient to constitute a red flag." *UMG Recordings, Inc. v. Shelter Capital Partners LLC*, 718 F.3d 1006, 1023 (9th Cir. 2013).

At oral argument, Wallshoppe argued that the two takedown notices Redbubble received in October of 2021 did constitute red flag knowledge that its copyright was being infringed, and thus Redbubble should have immediately implemented proactive screening using the tools at its disposal. Wallshoppe contends that earlier implementation of proactive screening would have prevented further infringing materials—including the material that was removed in July of 2022—from ever becoming available for sale in the first place.

As counsel for Redbubble points out, the Ninth Circuit has explicitly rejected the "take down, stay down" regime that Wallshoppe advocates here. *See, e.g.*, *UMG*, 718 F.3d at 1023–24. In *UMG*, the plaintiff brought a copyright infringement action against Veoh, the operator of a video-hosting website to which users could upload their own videos. *UMG*, 718 F.3d at 1011. Veoh used "various technologies" to filter some of the videos on its platform for infringing material, but other infringing videos remained by the time UMG filed suit *Id.* at 1013. Nevertheless, "some of Veoh's users were able to download unauthorized videos containing songs for which UMG own[ed] the copyright." *Id.* at 1013. As Wallshoppe does here, UMG argued that the defendant "should have taken the initiative to use search and indexing tools to locate and remove from its website any other content … identified in the notices." *Id.* at 1023–24. The Ninth Circuit rejected UMG's argument, explaining that "to so require would conflict with § 512(m), § 512(c)(1)(C) and [precedent] refus[ing] to 'impose ... investigative duties on service providers.'" *Id.* at 1024 (quoting *Perfect 10, Inc. v. CCBill LLC*, 488 F.3d 1102, 1114 (9th Cir. 2007).

Wallshoppe's argument fails for the same reason. When Redbubble is informed of infringing material, it is obligated to take the material down. But it is not obligated to "investigate" to find more potentially infringing material. *Id.* It is well-established by now that "[t]he DMCA notification procedures place the burden of policing copyright infringement—identifying the potentially infringing material and adequately documenting infringement—squarely on the owners of the copyright," and not on the service provider. *CCBill*, 488 F.3d at 1113.

Redbubble fulfilled its obligations to remove material where it had actual knowledge of infringement. Because Redbubble did not have actual or apparent knowledge of any other infringing material, it meets the third requirement for protection under § 512(c).

### 4. The Right and Ability to Control

Finally, to be eligible for safe harbor protection, Redbubble must show that "it did not receive a 'financial benefit directly attributable to the infringing activity'" if it had "'the right and ability to control such activity.'" *Mavrix*, 873 F.3d at 1052 (quoting 17 U.S.C. § 512(c)(1)). Redbubble does not dispute that it financially benefited from the sale of the Accused Products. Rather, Redbubble asserts that it does not have the right and ability to control the infringing activity. (Joint Br. at 35–36).

"In order to have the 'right and ability to control,' the service provider must exert substantial influence on the activities of users." *UMG*, 718 F.3d at 1030 (cleaned up). Importantly, "the pertinent inquiry is not whether [the service provider] has the right and ability to control [its] *system,* but rather, whether it has the right and ability to control the *infringing activity.*" *Io Grp., Inc. v. Veoh Networks, Inc.*, 586 F. Supp. 2d 1132, 1151 (N.D. Cal. 2008) (emphasis in original).

The facts of this case are similar to those of *Sid Avery & Associates, Inc. v. Pixels.com, LLC,* which also concerned an "online marketplace" to which users upload images "for customers to purchase as prints or on various products." No. 18-cv-10232-CJC-JEMx, 2021 WL 736258, at *4 (C.D. Cal. Feb. 24, 2021). At trial in that case, the

court heard testimony that defendant Pixels did not "encourage or incentivize the uploading of any particular content"; that contributors could "upload whatever images they choose … if they represent[ed] and warrant[ed] to Pixels that they own the rights in the uploaded image," after which the images would "instantly appear on the website"; and that Pixels did not "alter any uploaded images, nor [was] it involved with describing or classifying the images on its website." *Id.* Once a customer purchased a product via Pixels.com, Pixels would process the payment and transmit the order information to a manufacturer. *Id.* Though Pixels was "in contract with the manufacturers who produce[d] the goods sold, Pixels ha[d] no control over the employees, materials, prices, or products that manufacturers ma[de] or how they [were] labeled or shipped." *Id.*

The plaintiff in *Pixels.com* argued that Pixels had the right and ability to control the website and the products available on the website, and thus that it could control the infringing activity. *Id.* The court found, however, that Pixels' activity operating its website, processing payments, and transmitting order information to third-party printers "show[ed] only that it controls its operations as a service provider, not the infringing activity." *Id.* Pixels therefore did not have the requisite "substantial influence on the activities of its users" that would disqualify it from safe harbor protection. *Id.*

The same is true here. Redbubble has shown that contributors alone upload and manipulate the content to be offered for sale on the website. (JAF ¶ 31). When an order is placed, Redbubble's software "automatically performs various online services to facilitate the transactions that occur," (*id.* ¶ 53), including "connect[ing] third-party Sellers to third-party printers who print the products," (*id.* ¶ 54), and "automatically rout[ing] purchase order and shipping information to third-party printers," (*id.* ¶ 55), who then print and pack the products without the involvement of Redbubble personnel, (*id.* ¶ 56). These facts establish that Redbubble "controls its operations as a service provider, not the infringing activity." *Pixels.com*, 2021 WL 736258, at *4.

Wallshoppe disputes these facts only by pointing to the Redbubble Service Agreement, which reads, "Redbubble [will] facilitate the sale of your product which

16

includes payment, processing and arranging for manufacturing your product(s) in respect of the orders placed by the customers via the website and Redbubble will facilitate such payment, and manufacturing in accordance with reasonable business practices ….." (*See* JAE ¶¶ 54–56 (Wallshoppe's emphasis omitted)). Neither "facilitating" nor "arranging for" the sale and manufacture of a product, however, amounts to Redbubble exerting "substantial influence on the activities of its users" such that the safe harbor protections do not apply. As in *Pixels.com*, the facts show that Redbubble does not have the right and ability to control infringing uses. Thus, Redbubble has fulfilled the last requirement for DMCA safe harbor protection.

### III. CONCLUSION

Because the Court finds that Redbubble is protected from liability for copyright infringement under the safe harbor of DMCA § 512(c), and because the relief Wallshoppe seeks is therefore not available, the Court need not assess Wallshoppe's claims for direct and vicarious copyright infringement. Redbubble's Motion for Summary Judgment is **GRANTED**. The Motion to Deny Class Certification is **DENIED** as moot.

The Clerk of Court is directed to close this case.

**IT IS SO ORDERED.**

Dated: May 31, 2024

HON. WESLEY L. HSU
UNITED STATES DISTRICT JUDGE